Good afternoon. May it please the court, Phil Talmadge here representing the Tri-City Railroad Company as well as Randolph Peterson. TCRY is a small family-owned class 3 railroad that leases 16 miles of track from the Port of Benton in southwest Washington State. TCRY has served as the de facto maintenance agent for the port's track since 2002. Despite that relationship, the port has fundamentally altered it in many ways, assuming control over the track. The City of Richland has sought to promote its Center Parkway road project at the expense of TCRY's rail operations. When TCRY refused to knuckle under to these two governments, both retaliated aggressively against it. The District Court erred in dismissing TCRY's First Amendment retaliation claims against the port and the city, its tortious interference under state law claim against the city, as well as its reverse FCA claim against the port. We ask that the court reverse those decisions because fact issues abounded as to each. Let me turn first to the question of the 1983 claim and First Amendment retaliation. The court is well aware of the elements of such a claim for a prima facie case, as well as the protocol that both the Supreme Court and this court have established for the treatment of these kinds of claims. There were fact issues as to TCRY's prima facie case against both the city and the port. In connection with the port, the TCRY commenced a state law claim involving state constitutional issues associated with the rent-free use of the track by the Class 1 railroads, the Burlington Northern Santa Fe and the Union Pacific. Are you referring to the taxes that were purportedly owed by the port? Yeah, the tax claim that was asserted by the port against it was in retaliation for the TCRY state court lawsuit, which went to the heart of whether you could have this rent-free use of the track for essentially forever under the terms of the indenture that existed between the federal government and those predecessors to the Class 1 railroads. When was the state court action brought by TCRY? When was it brought? Correct. I believe it was in, I want to say it was in 2015 in the Supreme Court of Washington. I argued the case to the Supreme Court and the court resolved the case, I believe it was last year. So it's a case that's been around for a period of time. And then when was the retaliatory action brought by the city? Well, it's a little bit different. The city's retaliation was in retaliation for TCRY going to the Surface Transportation Board. So I'm asking you, so are you saying it was the port that retaliated because of the lawsuit? Both governments did. What was the retaliation on the part of the port? The port threatened a million dollar tax claim under the leasehold in lieu of tax under state law against Mr. Peterson. If he persisted in his state law action. The port threatened to bring an action against Mr. Peterson for the same, for the lease excise tax or the lease taxes. That was the retaliation in your view? That's correct, Your Honor. And of course, I should note that the port invoiced TCRY for rent each month and also invoiced them for payment of the leasehold in lieu of tax to Washington State's Department of Revenue. And TCRY paid it all along. That claim of a violation of the leasehold in lieu of tax never surfaced before the state court lawsuit was filed and hasn't surfaced since. It's noteworthy that the deafening silence of any leasehold in lieu of violation since the termination of that state law lawsuit or even during the pendency of that state law lawsuit, the port has simply abandoned that issue. Evidencing the fact that they didn't think much of it to begin with and it was probably bogus. I'm just trying to pinpoint exactly what the retaliatory actions were. So for the first amendment, what was the retaliatory action by the city? The city's retaliatory action was the TCRY prevented the city from condemning certain properties for its Center Parkway road project. And we went through the whole process before the Surface Transportation Board, including an appeal to this court. And so there was a prolonged period of time in which that litigation was pending. And the response by the city to that litigation was to basically go to the Union Pacific with whom TCRY had had a relationship from 2011 to 2017. And to tell them that, look, you've got to tell these people to stop. They used the Union Pacific as their cat's paw to get TCRY to abandon its position before the Surface Transportation Board. It was a pretty aggressive posture on their part. And I should point out... Wasn't that part of Union Pacific's contract that Union Pacific could not oppose the crossing? It was, Your Honor, but the noteworthy thing was that at the time the contract was entered into between the Union Pacific and the city, they knew full well that TCRY opposed the Center Parkway project. And for a period of six years, 2011 to 2017, there's radio silence on the part of the city. The city stood in its dislike of the fact that the TCRY, this little railroad, had the audacity to challenge its position at the Surface Transportation Board. But for that six-year period, they did nothing until finally when that litigation came to fruition, they decided at that point that that was enough. And they were going to use the Union Pacific as the basis for stopping TCRY at all costs. Are you suggesting that the city did not have the right to use that contract provision in the way it did? Well, they are arguing in terms of their argument on retaliation. They're claiming that this is a legitimate thing for them to do. But the fact of the matter is they are, in fact, as a matter of reality, interfering with the efforts by TCRY to engage in its business relationship, a long-term business relationship with the Union Pacific, a business relationship that had existed since 2002. And they had the ability... Are you saying that the contract provision could not be enforced in view of the potential interference with the business relation between TCRY and Union Pacific? Yes, I think that's our position, and it's clearly a position that applies as well to the argument advanced by TCRY with respect to its state law tortious interference claim. The argument on the part of the city is that it's privileged to engage in that kind of conduct because it has that contractual right. Again, a contractual right unexercised for a period of six years, but a position that under state law, in order for there to be a privilege, has to be exercised in good faith. And there's certainly a question of fact regarding whether or not there was a good faith exercise of that privilege under these circumstances. What does the delay of six years have anything to do with it? I mean, this is obviously a very, very contentious set of issues. Obviously, the court has been aggressive. The city of Richland has been aggressive. But it's hard to say that TCRY hasn't retaliated in its own ways by going to the Railroad Retirement Board and others. I mean, there's plenty of aggressive behavior on both sides here, counsel. So I'm hard-pressed to see why forbearance by the city for six years is abandonment of the right. Well, it's a right that they have, Your Honor, but it's coincidental. And this is the city's position. It's sort of the court's position also with respect to the fact that all of this is merely a coincidence, that coincidentally they decided at this juncture to come forward and exercise this right to oust TCRY. TCRY from the premises, but from the agreement that they had with the Union Pacific. But it's a coincidence that's too coincidental. And it's a question of fact that they're trying to assess. Even if it were intentional, if the city has a contract with Union Pacific and there is a clause in the contract that prohibits Union Pacific and its agents from challenging the crossing, if the city implements that provision, what cases that that can support an intentional interference with business relations? What's your strongest case to support that argument? I think clearly in the tortious interference theory, Your Honor, the clearest case on this is Green Sun. Judge Chun of the Division One of the Washington State Court of Appeals did an excellent job of laying out the elements of a cause of action for state law tortious interference, as well as the issues relating to privilege and concluded in that case. Questions of fact abounded with respect to the elements of tortious interference and questions of fact abounded with respect to good faith in the exercise of the privilege. Precisely the argument we're making here. Was that a contractual? Did that involve a contractual provision that was being enforced? It was a it was a matter involving an entity that was engaging in Washington State's legalized marijuana business, and I believe it was contractual at its root. But here we have a party exercising an explicit contract provision. And that's why I'm curious as to whether or not you have a case that is directly addressing that factual scenario where there is an explicit contract provision that's being utilized. And in a case that says in that context, there is a cause of action for intentional interference with business relations. In each one of the cases where this question of privilege has arisen, Judge Rawlinson, the issue of privilege is a contractual provision, right? But it's the basis for the exercise of the contractual provision is in privilege to engage in tortious interference. And the argument that you can do this at your leisure is something that Washington courts have rejected. Elkhon, the Washington State Supreme Court. You have the case involving the Tacoma Auto Mall. You have this case, Green Sun, all of which recognize that the issue of privilege, contractual or otherwise, is a question of fact, if not exercised in good faith. And good faith at its root is a question of fact in those circumstances. Similarly so with respect to tortious interference. Let me turn very quickly to the FCA case as well. I mean, I would point out that with respect to the First Amendment retaliation case, the trial court here both did not go through the usual protocol. It didn't shift the burden of proof once the prima facie case was established to the governments to demonstrate that they would have acted on these in the way that they did, but for the activities that were involved. The court relied in the case of the port on the Knorr-Pennington Doctrine. And we would submit, if anything, the Knorr-Pennington Doctrine applied in spades to TCRY and its exercise of its right in seeking state court relief and in seeking relief before the Surface Transportation Board. But with respect to the reverse FCA case, the argument here was that there's nothing to be seen, that the port legitimately responded to the inquiries from the Surface Transportation Board about its status. And questions of fact abounded about that as the court has seen from this record. The initial relationship between the parties in 2001 was that TCRY was the de facto maintenance agent for the port. The circumstances evolved dramatically. The port basically installed two Class I railroads as direct competitors to TCRY. It basically said, who can use the railroad? It said, who can be paid for this railroad by controlling whether tariffs could be imposed? And it decided what the future of the railroad was going to be. It had a 100-page master plan in which it proposed to spend millions of dollars indicating that it intended to take control of the railroad. And it said precisely that in that master plan at ER 3520. Its intent was to take control of the railroad. And that indicates, I think, quite forcefully that there was a question of fact about whether the port was a railroad operator. It certainly was a common carrier. And but for the fact that you have this railroad ventures decision out of the Surface Transportation Board, the port was clearly a common carrier and clearly in control of those tracks. The theory is that TCRY was the one that was doing this on a contract, was in control. But the facts betray the fact that the port increasingly exercised control with the direct purpose of squeezing TCRY out of the picture. And its consultants basically said that. You need only go to excerpts of record 850 and 851 to document the fact that its lawyers said the initial thrust of everything we're doing is to get rid of TCRY. And that's what they're attempting to do and are continuing to attempt to do. And for all of these reasons, we believe that there were fact issues here. And for that reason, the district court erred in granting summary judgment on these theories. All right, thank you, counsel. Who's going first, Mr. Harper or Ms. Lynch? Your Honor, Ken Harper. Good afternoon, Your Honors. May it please the court. Ken Harper for City of Richland and Peter Rogalski, Pele's defendants in this matter. Your Honor, I want to begin by turning to Mr. Talmadge's argument regarding the First Amendment. The issue, of course, that we're really in dispute on, I suppose, is when did a protected event occur and what retaliatory action, if any, followed? Mr. Talmadge argues that the retaliation arose from the protected event of TCRY going to the STB. We have heard nothing or we see nothing in the record. We've heard nothing from Mr. Talmadge regarding direct evidence of retaliation. I think that's understood. As to indirect or circumstantial evidence of retaliation, if Mr. Talmadge's argument is to be taken seriously, then we have a serious problem regarding proximity. The STB petition was in 2015. Mr. Talmadge also says that the event that constituted the adverse action was when the city, and I'm going to turn to whether he really means the city or he means a specific person at the city. He says the city went to UP and said, you've got to tell these people to stop. That's a reference to the city's private attorney, a fellow named Rob Wimbish, who asked for performance by Union Pacific of the Standard Form Railroad Track Use Agreement. What we have then is we have more than two years between the protected action of petitioning the STB in 2015 and Mr. Wimbish going to UP to demand performance of the track use agreement. Mr. Talmadge in the briefing suggests that, in fact, there was a continuous status of protection conferred on TCRY during the entire pendency of the STB decision. There's no case that supports that view. In EEOC Seventh Amendment cases, or excuse me, in Title VII, rather, EEOC cases, there is a concept of protected activity during the pendency of a Title VII matter. But even then, the court has required some form of active participation, testimony, depositions, something. The closest case on point, Your Honor, is probably Howard v. Coos Bay. In that case, in fact, there was a series of events that supported the notion of city retaliation. However, even in that case, the court dismissed or affirmed dismissal, I should say, because the court looked to the broader context. In the broader context in the present case, TCRY simply has no evidence of retaliation. Judge Vibey makes a great point. It's critical, I think. It's part of the trial court's understanding as well. These parties were adversarial. They were antagonistic. Antagonism is not retaliation. So the challenge for TCRY becomes very difficult. TCRY has to somehow demonstrate that business adversarialness is a proxy for retaliation. In the absence of any concrete evidence, it is not going to be sufficient under Pratt v. Roland, certainly. Or another applicable case would be Allen v. Rannan. It's not sufficient to just simply say that this is coincidence. That's what Mr. Talmadge argues. That's not sufficient. I said earlier, and I want to return to this point, who precisely does TCRY have any retaliatory evidence relating to, even if circumstantial? The answer is they point to an email of the city's outside counsel, Rob Wimbish. In the reply brief, TCRY says that it was Mr. Wimbish's email that communicated Richland's official policy. The problem with that argument is Monell. The problem with that argument is they have no indication that Mr. Wimbish was an actual policymaker of the city of Richland. In Ellens v. City of Sierra Madre, a case that Judge Rawlinson would be familiar with, 710 F. 3rd, 1049, first-minute retaliation case. The difficulty for the plaintiff was that there was no evidence that the retaliatory act, the alleged retaliatory act, was that of a city policymaker. As we know from Christie v. IOPA, it isn't sufficient, if we're going to argue ratification, it isn't sufficient just simply that somebody at the city acknowledged that Mr. Wimbish sent these emails. The emails themselves, we don't consider retaliatory. They don't say anything relating to a retaliatory subject. But even if we're to somehow impugn them with that, there's nothing in the record that suggests that any policymaker at the city acknowledged these, acknowledged their improper retaliatory conduct, and ratified the retaliatory nature. Your counsel, the retaliatory action that's been asserted is the enforcement of the provision in the agreement between UP and the city. So you can't disclaim, can you, that that was a city action? Your Honor, the point that I think is made in T. Sierra White's brief is that there is retaliation imbued in Mr. Wimbish's email. Disregarding the email, I'm talking about the action of enforcing the contract which resulted in the severance of the relationship between T. Sierra White and UP. You're not arguing that that wasn't a city action, are you? The enforcement of the contract isn't retaliatory. Well, but that's his argument, though. So the fact of the emails is, in my mind, a separate issue than the actual severance of the relationship between T. Sierra White and UP. Your Honor, I appreciate the point of your question. Then I think we just simply have ships passing the night. If that's the event, then the argument essentially is that any action taken by the city through any agent with whatever motive, simply because there was an STB decision filed or an STB action filed several years previously, is per se or at least retaliatory sufficient to overcome summary judgment. And there's no case that supports that. That really is now crabby rolling. There has to be something more to demonstrate retaliatory action. The last thing I want to do, Your Honor. I understand this argument is that there was no privilege to sever to terminate the contract. There was no there was no privilege to enforce that provision in the contract that would result in termination of the agreement between UP and T. Sierra White. That's his argument. Well, Your Honor, if we're going to talk about privilege, then I don't think we're going to retaliation. I think we've shifted to tortious interference at this point. And to that point, Your Honor, I would just simply encourage the court to look at what Mr. Talmadge says is best case. That's Greenson. It's a state court case in which there was no contract right. It had to do with a marijuana license or seeking city approval of permits. That case does not speak to privilege in context of a contract. In fact, if you look at the case closely, that case discusses good faith as a standalone affirmative defense, not good faith in context of enforcing a clear contractual right. That is not part of Washington tortious interference law. Your Honor, I am through with my portion of the split time. I don't want to be courteous to counsel. Thank you. All right. Thank you, counsel. Ms. Lent. Good afternoon, ma'am. Please. The court. Hi, Lynch. On behalf of the court of Benton. Beginning with the 1983 claims and the application of the more Pennington doctrine. There's really only one question before that court. And that is whether the port's third party complaint was objectively baseless. And here's why it wasn't. TCR white plate leasehold excise tax on its cash rent of approximately $30,000 a year. The primary consideration for its lease, however, was its obligations to maintain the track. And leases that are older than 10 years in a Washington law can be looked out by the Department of Revenue and determines taxable rent. Not based on the contract rent, but based on the fair market value. And then in July of 2016, the port received an appraisal of the trackage and the building that TCR wide leases. And from that determined that the fair market value of that lease property was $1.2 million. So, TCRY was paying LEC on $30,000 and not $1.2 million. So, this all came to a head because about a month after receiving the appraisal, Mr. Peterson filed his individual tax payer claim. And one of those allegations was that the port should be collecting leasehold excise tax from BNSF and UP based on the value that they derived from the tracks. And as Mr. Peterson alleged in his lawsuit, the port itself can be liable if it doesn't properly collect and calculate LET. The port did the math and it looked that it could possibly be on the hook for a million dollars in back taxes that TCRY hadn't been paying. Now, leading up to all of this, the port's asking TCRY for information. TCRY doesn't get it. The port decides, well, maybe we'll file a declaratory judgment action asking the court to make the call on whether or not TCRY should be paying a higher leasehold excise tax. The port ultimately decided to pursue a different strategy and to just seek dismissal, which it did. But that doesn't make the underlying claim or underlying third party complaint at all objectively baseless. And in fact, none of those predicate facts are in any way in dispute. TCRY has also put in its briefing, morphing its claim about, you know, the port's other conduct that it claims is retaliation for Mr. Peterson's 2016 lawsuit. And I'll just correct Mr. Talmadge, that was actually brought in in August of 2016. But importantly, the fourth amendment complaint doesn't assert claims based on the port's SBB petition or tariffs. And I would direct the port to TCRY's briefing on the 1983 claims, where it doesn't argue a claim on these basis. The district court's decision dismissing all claims related to BNSF and UP, which hasn't been appealed. And the party's motion for clarification, in which Peterson and TCRY said that they've had two remaining claims, breach of contract and 14th amendment. In other words, their first amendment claim was premised on this proposed third party complaint. Those claims have been abandoned. Nora Pennington was properly applied. The court's third party complaint was immunized. So I'll move on to the QTAM claim. Before the district court or before this court, neither TCRY nor Peterson have met any of the elements of this claim. And they can't do it because the court did not knowingly lie to the federal government about its obligation to pay an employment tax for employees it doesn't have. So beginning with Fall City, the question is, well, you know, is the port a railroad operator? The port doesn't have any railroad employees. It doesn't have any crews. It doesn't have anybody out there operating trains, locomotives, switches, anything. This lease specifically says that TCRY, not the port, is the operator. And then Mr. Peterson testified in this case, and this is at the port supplemental ER 271 to 73, that as of the signing of the lease, TCRY is the operator of the railroad. And as of the time of his deposition, TCRY is the operator of the railroad. Counsel? Opposing counsel's specific attribution of falsity was the statement that nothing had changed since the prior adjudication. What's your response to that? Well, certainly. So what the port's independent counsel said in his letter to the IRB in a single-sentence legal argument, he said nothing of significance had changed that would warrant a change to the port's classification. And then he qualified it. And he explained exactly why. And he applied the railroad venture test to the facts. And then probably most importantly, he provided all of the source documents. That includes the lease, the court-approved operating plan, the federal district court case from 2011 discussing UP and BNSF's rights to the tracks in relationship to the lease. It included the TCRY's petition to the STB in which TCRY alleged that the port, not it, was the operator. And then his letter went on to confirm that they, you know, the port hired contractors, that it oversaw operations on the line as a landlord, that it arbitrated disputes. In other words, the port showed its math. And it qualified its statements. And it confirmed the facts as TCRY alleged them. And that in itself defeats falsity under this court's decision in Brewer v. Honeywell. After receiving all of that information, the IRB said the port was not a covered employer. And this is dispositive because the proper form for challenging that is through that administrative process, not in a key TAM claim. And TCRY tried that. They filed an appeal with this court. And the IRB moved to dismiss it. And then, of course, you know, there's additional elements than just falsity. And the knowledge element is rigorous. And that means that the purported misstatement is known to be false. It doesn't mean that it's incorrect. And it's not met by a difference of opinion or legal interpretation. Because this court has said it means it's a lie. And we don't have that here. What you have is the port receiving the inquiry from the IRB and consulting with counsel, looking at the facts, applying them to the law, and concluding that it is not a covered employer. And again, it showed its math. TCRY, in a red herring argument, they said, well, but the port didn't answer all of these background questions. But that's not a lie by omission where the port doesn't identify who its CEO is. It doesn't have one or who its owners are. It doesn't have owners. Instead, what it said is, hey, here's all of the source information. We think this is what you're looking for. But if you want something else, please come back and tell us. We're happy to work with you. The IRB didn't come back for more. And it concluded that the port is not a covered employer. You know, going into materiality, TCRY and Peterson claim that that's not an element. It is. If we look at the allegations that they're pled, and they completely disregard the fact that, again, the port has provided all of the source information. The IRB had the information, had the allegations, and they determined not a covered employer. All right. Thank you, counsel. Rebuttal? Yes, Your Honor. Thank you. In response to the port's last statement, what they didn't disclose, state court litigation, the denial of tariff approval, the existence of a 100-page master plan in which they decided they were going to assume control over the railroad, their options list, their direction to oust TCRY through their lawyer from the agreement that they had. All of those were not disclosed. And, of course, TCRY didn't get to present that information to the board because its rebuttal information was not permitted. In terms of the First Amendment retaliation claim, with respect to the city's argument, Mr. Harbert insists, continues to insist on a truncated sense of what litigation was all about. The litigation that was taking place was filed in 2015 but persisted until 2017. And that was coincidentally the time that the city engaged in the activities that the city engaged in. So, in this instance, both governments would have you believe that you can defy reality. You mean to tell me that the lawyer for the city of Richland is telling the Union Pacific's lawyer, we want these people out. We want them gone. And the veiled threat that that represents is not sufficient to understand, not sufficient for the UP to understand on their part that that's exactly what the city was trying to accomplish? And in the case of the port, nor Pennington? I mean, this is a circumstance where my clients were the ones that were petitioning for redress of grievances. And for them to argue that this lawsuit that they were going to propose to file, a lawsuit that conveniently disappeared and has never surfaced since, is not retaliatory? It's an amazing defiance of reality. We ask the court to grant our request that the trial court's decisions be reversed and that the many fact issues be resolved appropriately by a trier of fact. Thank you. All right. Thank you, counsel. Thank you to all counsel. The case just argued is submitted for decision by the court. That completes our calendar for the day. We are in recess until 1 o'clock p.m. tomorrow. This court for this session stands adjourned.
judges: Rawlinson, Bybee, Moskowitz